DAVIS-WOOD LUMBER CO., INC. v. LADNER.

Division B. Feb. 12, 1951.

No. 37797 (50 So. (2d) 615)

864

Eaton & Cottrell, and **Davis & Hammond,** for appellant.

Jason H. Floyd and Bidwell Adam, for appellee.

868

**Ethridge, C.**

This case involves four questions: (1) whether appellant, a corporation organized and domiciled in Louisiana, was doing business in Mississippi from 1946 to 1948; (2) assuming that it was, whether the circuit court acquired jurisdiction over it under Code Sec. 1437 after it had ceased to do business in Mississippi at the time this action was brought, as to an action on a contract arising out of such previous business; (3) if there was jurisdiction, whether the statute under these facts violate the due process clause of the Fourteenth Amendment; and (4) whether there was sufficient evidence to support the jury's acceptance of appellee's version of his contract with appellant. We hold that appellant was validly subject to the jurisdiction of the circuit court, and that the judgment for appellee on the contract arising out of such business previously done in Mississippi is affirmed.

Appellant, the Davis-Wood Lumber Company, is a Louisiana corporation engaged in the retail lumber and building material business with lumber yards and offices in three cities in that state. Appellee, Edwin Ladner, is a resident citizen of Harrison County, Mississippi. Prior to the transactions involved in this suit he had for many years been engaged in sawmilling, logging, and timber operations in Harrison County, in addition

to the operation of a small store in that county. He owned some land and timber, including a farm just north of Pass Christian. Shortly after the end of World War II, two of the appellant's officers were Will Davis, President, and Robin M. Wood, Sr., Secretary and Treasurer. According to the appellee's testimony, Wood, representing the Company, negotiated with him around April 1, 1946, about appellee cutting some timber in Mississippi for the Company. He stated that after some negotiations it was agreed that the Company would furnish him a sawmill with which to manufacture the timber which would be obtained off of appellee's property, and that appellant would pay him $40 a thousand for such manufactured lumber. Ladner had had previous dealings with appellant Company in 1927 when he shipped to it some piling, and he stated that at that time Wood also had acted for the corporation. Appellee had a good deal of experience in operating a sawmill, and appellant, through Wood, agreed, according to appellee's case, to bring the mill up to Harrison County and let him cut the lumber for the Company. Appellant would also furnish the trucks, and appellee would pay the labor and other expenses. He stated that nothing was said about him renting from the Company or any one else the sawmill and trucks.

Operations began about the second week in May, 1946, cutting the timber on appellee's property. The manufactured lumber was delivered to a Company truck at the mill in Harrison County which was on appellee's property. Appellant sent its trucks over to the mill from Louisiana and picked up the lumber. The drivers of the trucks were working for appellant, and the trucks and trailers had printed upon them ''Davis-Wood Lumber Company''. These trucks came over several times each week to pick up the lumber, from May, 1946, until April, 1948, during which period the various transactions involved in the contract in issue took place. From time to time the appellant sent appellee parts for the repair

of the sawmill. They were charged to appellee in accordance with his agreement.

In July, 1946, Wood representing the Company, appellee said, made an agreement with Ladner under which he would continue to operate the sawmill for appellant manufacturing timber from lands other than his own, for which he would receive $14 a thousand for cutting it at the mill. A man by the name of Kenmore hauled the timber to the mill up until the latter part of July, 1946. It appears that he was working for appellant in logging and hauling the timber, but the record is not clear in this respect. In the latter part of July, 1946, Wood, representing appellant, advised him that they could not get enough logs under the present arrangement, and appellee offered to "take over all the trucks and trailers and get the logs out of the woods and bring them to the mill for $32.00 a thousand". Appellee would have the lumber loaded on Company trucks when they arrived at the mill. He testified that no mention was made at this time about him paying any rents for the truck or the mill. Wood accepted that proposition for the Company, appellee testified, and operations continued on that basis. Wood had Kenmore deliver the trucks to appellee the next day, and thereafter appellee managed the entire operations of cutting the timber, hauling it to the mill, manufacturing it, and loading it on the trucks and trailers which appellant Company continued to send over to Harrison County. Will Davis testified that the timber used was owned by him and Wood individually. Appellee paid the salaries of the men cutting timber and of employees at the mill, and also paid for repairs on the trucks which he used in hauling the timber from the woods to the mill. Appellant furnished the men at the mill with work aprons worn in front of them to prevent them from getting gum from the timber on them, on which was printed "Davis-Wood Lumber Company". Appellee operated the mill under those conditions. Appellant paid "for stacking some lumber, because I did

not have anything to do with the stacking". Shortly thereafter appellant became dissatisfied with the quality of the sawing of the timber, and agreed with appellee to pay one-half the salary of a new sawyer recommended by the Company.

In late November, 1946, appellee received his first statement from appellant. Other statements followed over the entire period of the contract about two months apart. This first statement, as did the others, recited the number of feet of timber which had been sawed and gave Ladner credit for his contract price. It charged him with parts which had been shipped to him for the mill, and then had an item designated "mill truck and trailer rent". This item set out as "mill rent" the sum of $2 per thousand feet of timber, as "truck rent" the sum of $2 per thousand feet of timber, and as "trailer rent" the sum of $1 per thousand feet of timber. These rent items were deducted from the statement of the amount owed to Ladner. Appellee testified that Wood handed him the first statement, and that he protested the charges for rent, stating that he had not agreed to pay any rent, and that in reply Wood said for him to get and cut the lumber and "I will see you get it later . . . . we will get it for you later". He said that his wife was present at that time, and that he made objection to the rent charges on several other occasions to Wood, in reply to which Wood, representing the appellant, advised him that he would see that it would be taken off of Ladner's account. Operations continued on a regular and substantial basis until about the last of March, 1948. Some small cutting was done in May, 1948. Appellee testified that he continued to object to the rent charges made by the Company; that his objections were made to Wood, and each time Wood advised him that the Company would remove those charges before final settlement. However, when operations ceased appellee said that the Company, acting through Wood, refused to remove the rent charges from his account. Appellee

then undertook to hold the mill in his possession until a final, satisfactory settlement. Wood brought a suit in 1948 in replevin for the mill, asserting that he had purchased it from Will Davis in 1948, and obtained possession of it. In March, 1948, Ladner wrote a letter to the Company, directed to Wood, in which he stated that he was coming down the next morning, and told Wood to have statement of "all rent charged me".

Ladner testified that he wrote this letter in order to get a final statement and understanding on the rent and other charges, and that he did not at any time agree to pay the rent. This communication is so ambiguous that it is not of any probative value on the terms of the agreement. Ladner admitted that he received statements about every two months over the entire period of the contract, in each of which there were charges to him of the rents, but he said that he regularly protested to Wood, the officer of the Company, about it, and Wood each time advised him that he would see that no such charge was made. He did not complain to Davis, president of the Company. In the operations of the mill, Ladner paid the social security tax and deducted the witholding federal income taxes of employees. He managed and paid for the operations of the mill and the salaries of its employees.

Ladner's contract price for selling and manufacturing his and other lumber was paid to him by Davis-Wood Lumber Company, appellant, by Company checks, and from time to time he had written correspondence with the Company about the account. Ladner testified that most of his dealings during the two years of these transactions were with Wood, representing the Company. Davis came over to the mill only occasionally. During most of the period of operations Wood lived close by the mill and usually slept and ate at Ladner's home. During this period Ladner said that Wood was taking care of the Davis-Wood Lumber Company's interests "seeing the lumber was cut right and put on the trucks

right.'' Wood telephoned to the Louisiana office of apppellant ''most every night''. These calls were devoted largely to advising the Company when a truck was needed to come and load the lumber and for necessary parts. Ladner's son-in-law testified that he was present in Ladner's home in July, 1946, when Ladner agreed with Wood for Ladner to handle the entire operation, and that nothing whatever was said about the rent charges at that time. Ladner's daughter testified to the same effect, and also said that she was present when her father protested to Wood about the rent charges in the November statement, and that Wood advised him the Company ''would see about it'', and not to worry. Appellee's wife testified that Wood lived in their home for most of the two-year period during which the lumber operations were conducted; that she was present when her husband and Wood agreed for Ladner to take over all operations, and nothing was said about the rent; and that she and her husband protested to Wood every time they received a statement with the rent charges, and he advised them that the Company would not make those charges.

Appellant does not dispute the fact of the sawmill's operation, nor that its trucks at regular intervals picked up the lumber in Harrison County for hauling to their Louisiana stores. It contends that Wood was operating individually in Mississippi in buying up timber, poles and piling for himself. Davis testified that he owned the mill and the truck and trailers, and that he had agreed individually with Ladner to rent him those items for the timber cutting operation. Appellant states that Ladner had no mills or trucks; that Davis individually simply rented those items to him; that Wood also was transactions constituted no direct financial connection be- operating for himself alone in Mississippi; and that their tween Ladner and the Company. Wood died some time in 1949 before this suit was filed. Davis testified that he had an express understanding with Ladner about the

rent charges as they were made to him, but that no one else was present or knew of the arrangement other than Davis and Wood, and that Ladner was not an employee of the Company and had no connection with it. With reference to Ladner's own timber and that furnished by Wood, he was selling it as manufactured to Davis and Wood individually, and they in turn sold the lumber to the Company. Appellant operated as the middle man or intermediary in paying Wood and Davis for all of the timber they sold to the Company, and in making payments for Wood and Davis individually to Ladner for his services. During these transactions, John Davis, secretary of the Company, owned about forty per cent of the stock, Wood about twenty-eight per cent, and the remaining thirty-two per cent was owned by Will Davis. Appellant did not introduce any record books which it might have had concerning accounts between the Company and Will Davis and Wood individually with reference to the transactions in question.

The foregoing states substantially the cases for both sides. The factual dispute centers around whether Wood and Davis were acting individually or for appellant in contracting with Ladner, and whether the contract authorized the charges for rents of the mill, trucks and tractors. The jury found for appellee on both issues.

The foregoing circumstances amply justify a conclusion that appellant was doing business in Mississippi within the terms of the pertinent process statutes during the stated period from 1946 to 1948. Miss. Code of 1942, Sec. 1437, provides: "All civil actions for the recovery of damages brought against a non-resident of the state of Mississippi may be commenced in the county in which the action accrued. Service of process may be had in any county of the state where the defendant, or any of them, may be found.

"Any non-resident, person, firm, partnership, general or limited, or any corporation not qualified under the constitution and laws of this state as to doing business

herein, who shall do any business or perform any character of work or service in this state, shall, by the doing of such business or the performing of such work or services, be deemed to have appointed the secretary of state, or his successor, or successors in office, to be the true and lawful attorney or agent of such non-resident, upon whom process may be served in any action, accrued or accruing from the doing of such business or the performing of such work or service, or as an incident thereto by any such non-resident, or his, their or its agent, servant or employee. The doing of such business or the engaging in any such work or service in this state shall be deemed a signification of such non-resident's agreement, and equivalent to an appointment by, such non-resident of the secretary of state of the state of Mississippi, or his successor or successors in office, to be the true and lawful attorney or agent of such non-resident upon whom may be served all lawful process in any action or proceeding against any such non-resident for any cause of action which has accrued or may accrue in this state." Sec. 1438 provides for service upon the Secretary of State of two copies of the summons. He must mail one to the defendant. The clerk of the trial court must send by registered mail to defendant a copy of the declaration or bill. Under Sec. 1439 the trial court may order such continuances "as may be necessary to afford such non-resident reasonable opportunity to defend the action". Service of process in the prescribed manner has the same effect as personal service within the state.

 Appellant and appellee executed the contract in Mississippi, and it was wholly performed within this state, final delivery of the manufactured lumber being made on appellant's trucks in Harrison County. The contract involved a continuous and substantial series of transactions covering a period of two years during which appellant sent its trucks into the state several times each week to pick up the timber. During most of this period Wood made regular telephone calls to the Com-

pany with reference to the time for sending company trucks to pick up the lumber and with reference to needed supplies, parts, and repairs for the mill. The Company paid one-half of the sawyer's salary and for the stacking of the lumber, or at least a substantial part of it at the mill. The activities carried on in Mississippi by appellant resulted in the acquisition of large quantities of lumber for resale. They were within the scope and purpose of the usual activities of appellant. They were not isolated incidents, but occurred continuously in this state over a period of almost two years. They were substantial in scope. This action arose out of those transactions. These activities of the Company within the state are substantially undisputed. The dispute turns on whether Wood and Davis were acting for the company or individually. The jury found the former, and a judgment was granted to appellee for the rents improperly charged.

■■ Whether a corporation is doing business in a state in the sense required for a process statute is a question dependent primarily upon the facts and circumstances of each particular case. A less strict interpretation of the phrase "doing business" is applied where there is an issue of whether a state court has jurisdiction, than is applied where the statute involved is one stating that a corporation must qualify before doing business in order to have access to the courts of the state. This distinction is proper because a strict interpretation in favor of the corporation on a jurisdictional issue would in many cases force the citizens of the state to resort to another jurisdiction in order to maintain suits against foreign corporations as to matters arising out of the transactions within the state. There have been only a few Mississippi decisions involving this situation. See Saxony Mills v. Wagoner, 1908, 94 Miss. 233, 47 So. 899, 23 L. R. A., N. S., 834; Gridley, Maxon & Co. v. Turner, 1937, 179 Miss. 890, 176 So. 733, 177 So. 362; Lee v.

Memphis Publishing Co., 1943, 195 Miss. 264, 14 So. (2d) 351, 152 A. L. R. 1428.

In A. L. I., Restatement of Conflict of Laws, Sec. 167, it is concisely said that "doing business is doing a series of similar acts for the purpose of thereby realizing pecuniary benefits, or otherwise accomplishing an object, or doing a single act for such purpose with the intention of thereby initiating a series of such acts". Where a corporation has entered the state through its agents and is engaged in carrying on and transacting through them a substantial part of its ordinary business on a regular basis, it is doing business within the state so as to be subject to process. The fact that none of several acts or transactions considered separately constitute "doing business" is not conclusive. 23 Am. Jur., Foreign Corporations, Sec. 361. Judge O. W. Holmes, in Edwards v. Chile Copper Co., 1925, 270 U. S. 452, 46 S. Ct. 345, 346, 70 L. Ed. 678, said that the court "cannot let the fagot be destroyed by taking up each item of conduct separately and breaking the stick. The activities and situation must be judged as a whole". Jurisdiction "is based upon the broad principle that a state ought, as a matter of justice and fairness, to be permitted to control the doing of business within its borders to the extent of making the person doing the business answerable in its courts with respect to claims arising out of the business". A. L. I., Restatement of Judgments, Sec. 22, page 105. Smolik v. Philadelphia & Reading Coal & Iron Co., D. C. S. D. N. Y. 1915, 222 F. 148; Hutchinson v. Chase & Gilbert, 2 Cir., 1930, 45 P. (2d) 139; Scott, Jurisdiction Over Non-Residents Doing Business Within A State, 32 Harv. L. Rev. 871, 883 (1919); Goodrich, Conflict of Laws, pages 214-216. Here appellant's contract with appellee was executed and performed in this state over a period of about two years. Appellant sent its trucks and drivers into the state for the lumber several times a week and had one of its officers practically living here and keeping in day-by-day

touch with appellant's offices as to the demands of the transactions. Appellant paid for stacking the lumber and part of a sawyer's salary. These and other circumstances were a continuous and substantial series of transactions within the state out of which this cause of action arose. These facts more than suffice for a jurisdictional basis for this suit. 20 C. J. S., Corporations, Sections 1920, 1828-1842; 23 Am. Jur., Foreign Corporations, Secs. 366-383; J. L. Alford, When Is A Foreign Corporation "Doing Business" in Mississippi? 13 Miss. L. J. 548 (1941); Schweizer, Special Appearances in Mississippi, 19 Miss. L. J. 59, 76-80 (1947); Annotation, 12 A. L. R. (2d) 1439; see also J. M. Stevens, Jr., Jurisdiction and Venue of Transitory Actions Against Nonresidents of Mississippi, 14 Miss. L. J. 495 (1942).

In applying the various statutes allowing process upon or requiring qualification of corporations "doing business" in Mississippi, no test can be used uniformly in determining whether or not the corporation is "doing business" within the meaning of the particular statute in question. The criteria in each case must necessarily be *ad hoc* in nature, both as to the particular facts and as to the nature of the statute sought to be applied, that is, whether it effectuates regulation, taxation, process, or other governmental purpose. 23 Am. Jur., Foreign. Corporations, Secs. 360, 362. The test oftentimes is stated in terms of "presence" within the state, or "consent" to process, but these criteria are fictitious where there is in fact no consent and the corporation is not present by agents in the state. The fact that the activities relied on to constitute "doing business" are the identical ones with respect to which the suit is brought is significant. Ibid., Sec. 363. That is a factor connecting the corporation's physical activities in the state to the fairness of an insistence that it will be suable for them in such state. This is illustrated by the present action, where there was entrance into the state by its agents who performed the corporation's usual business functions in

a continuous, regular manner. From those actions this contract resulted. The outer bounds of "doing business" and the "minimum contact" requirement of the United States Supreme Court are not determinative here, because appellant, from 1946 to 1948, was "doing business" in Mississippi within the terms of the aforesaid more restricted definition of the phrase.

Miss. Code of 1942, Secs. 1437-1440 apply to contract, as well as tort actions, growing out of the business or acts done within the state. We think that was the legislative purpose. The terms of the statute itself confirm this. It refers to "all civil actions for the recovery of damages . . . ." In describing the activities contemplated, the statute refers to foreign corporations "who shall do any business or perform any character of work or service in this state . . . ." As to such corporations process "may be served in any action, accrued or accruing from the doing of such business or the performing of such work or service . . . ." The doing of such business shall constitute the Secretary of State as the agent of the foreign corporation for process "in any action or proceeding against any such non-resident for any cause of action which has accrued or may accrue in this state". Clearly the statute was designed to apply to contract, as well as tort actions, which have accrued in this state. Condon v. Snipes, 1949, 205 Miss. 306, 38 So. (2d) 752, expressly held that this act applied to an action on a contract arising out of the business done within the state. And the present suit is in assumpsit for breach of an oral contract. Sugg v. Hendrix, 5 Cir., 1944, 142 F. (2d) 740, 743, applied the statute to a tort action and is not contrary to this view. See Goodrich, Conflict of Laws, pages 213-214 (3rd Ed. 1949); A. L. I., Restatement of Judgments, Sec. 30. As was said in Sugg v. Hendrix, supra, "the thought is not shocking that one who comes into a state for the purpose of conducting his business in that state should be made amendable to the courts and laws of the state and answerable to its

citizens for damages sustained by them which were the result of the business transacted in the state''.

Moreover, the fact that the appellant was not doing business in Mississippi at the time process was served upon its statutorily designated agent for process does not prohibit jurisdiction. Code Secs. 1437-1440 were in effect during the period in which appellant was doing business here. They provided that subjection to jurisdiction of Mississippi courts by process under that statute was a consequence of doing business in the state as to actions arising out of the business done in Mississippi. This contract action arose out of the business done here by appellant. We have not found any decisions applying this particular type of statute to a cause of action which arose within the state before the withdrawal, but analogous are those cases where the foreign corporation qualified, appointed an agent, then withdrew, and the suit was for acts done in the state before withdrawal. Mutual Reserve Fund Life Ass'n v. Phelps, 1903, 190 U. S. 147, 23 S. Ct. 707, 47 L. Ed. 987; Dansby v. North Carolina Mut. Life Ins. Co., 1936, 209 N C. 127, 183 S. E. 521; Yoder v. Nu-Enamel Corp., 1941, 140 Neb. 585, 300 N. W. 840; State of Washington ex rel. Bond & Goodwin & Tucker v. Superior Court of Washington of Spokane County, 1933, 289 U. S. 361, 53 S. Ct. 624, 77 L. Ed. 1256; Goodrich, Conflict of Laws, page 212, (3rd Ed., 1949); see also Walters v. Curtis Candy Co., 1935, 172 Miss. 187, 159 So. 560; 23 Am. Jur. Foreign Corporations, pp. 484, 500; 20 C. J. S., Corporations, Section 1920, p. 170; A. L. I., Restatement of Conflict of Laws, Sec. 93. These cases are not based upon the ''presence'' or ''consent'' theory, but upon the idea that it is reasonable and just to subject the corporation to suit in the state, as though it had consented, where the action is based upon rights arising from the activities within the state. See also International Shoe Co. v. State of Washington, 1945, 326 U. S. 310, 66 S. Ct. 154, 90 L. Ed. 95.

Nor do we think there is any denial of due process under the Fourteenth Amendment of the United States Constitution, as is urged by appellant, in (a) extending Code Secs. 1437 et seq. to contract, as well as tort actions, arising out of business or acts done within the state, or (b) applying the "doing business" concept to the present facts. Both propositions are interrelated and are controlled by decisions of the United States Supreme Court. Kane v. State of New Jersey, 1916, 242 U. S. 160, 37 S. Ct. 30, 61 L. Ed. 222, and Hess v. Pawloski, 1927, 274 U. S. 352, 47 S. Ct. 632, 71 L. Ed. 1091, dealing with process upon non-resident motorists for injuries sustained in the operation of a car within the state, represented the first extension of earlier constitutional limitations upon substitute process for personal judgment upon non-residents. Pennoyer v. Neff, 1877, 95 U. S. 714, 24 L. Ed. 565. See Scott, Hess and Pawloski Carry On, 64 Harv. L. Rev. 98 (1950). Henry L. Doherty & Co. v. Goodman, 1927, 294 U. S. 623, 55 S. Ct. 553, 79 L. Ed. 1097, permitted substitute process upon an agent of a non-resident selling corporate securities in Iowa. The idea at that time seemed to be that the operation of motor vehicles and the sale of securities are fraught with danger and economic harm to the general public, and for that reason can be brought within the control of the states.

In International Shoe Co. v. State of Washington, 1945, 326 U. S. 310, 66 S. Ct. 154, 158, 90 L. Ed. 95, the State of Washington sued for unpaid contributions to its unemployment compensation fund. The Company had no offices in Washington and no merchandise there, but prior to this suit employed eleven salesmen who resided in Washington and were under the control of the Company's St. Louis office. They could only solicit orders subject to acceptance in St. Louis. The salesmen displayed their merchandise to purchasers and their operations resulted in a substantial volume of sales. In upholding the state's jurisdiction by substitute process for personal

judgment, the Court said that "due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " The Court rejected a "mechanical or quantitative" test of doing business, and said that the question of whether due process is satisfied depends upon the "quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure". One authority has said that this approach "of the court throws the matter into a general test of reasonableness in view of the nature and kind of defendant's local activities". Goodrich, Conflict of Laws, page 216. The activity will be considered in relationship to the purpose for which it is sought to assert jurisdiction.

This approach was again used by the same court in Travelers Health Ass'n v. Com. of Virginia, 1950, 339 U. S. 643, 70 S. Ct. 927, 930, in which appellant, a Nebraska insurance association conducted its business entirely by mail and solicited new business through the unpaid activities of its Virginia policy holders. The Virginia Corporation Commission, notifying appellant by registered mail, instituted cease and desist proceedings to compel compliance with the Virginia Blue Sky Laws, and after a hearing made an order forbidding future solicitation and sale in Virginia until a license was procured. The Court, relying in part upon the International Shoe case, held that the activities of the Company, despite the absence of agents within the state, furnished a sufficient jurisdictional basis for the proceedings. The Court accorded " 'great weight' to the 'consequences' of the contractual obligations in the state where the insured resided and the 'degree of interest' that state had in seeing that those obligations were faithfully carried out. . . . Metaphysical concepts of 'im-

plied consent' and 'presence' in a state should not be solidified into a constitutional barrier against Virginia's simple, direct and fair plan for service of process on the Secretary of the Commonwealth.'' See also Mullane v. Central Hanover Bank & Trust Co., 1950, 339 U. S. 306, 70 S. Ct. 652.

In Condon v. Snipes, supra [205 Miss. 306, 38 So. (2d) 756], this Court pretermitted the question of ''the validity of the last mentioned statute in cases where the defendant is not subject to state regulation''. That question is now presented, and we hold that where the action arises out of the activities of the non-resident in the state, Sec. 1437 et seq. are applicable. This is in accord with the terms of the statute and the principle of Condon v. Snipes, Hess, v. Pawloski, and the International Shoe and Travelers Health Association cases. Any distinction between jurisdiction founded upon doing business in a state which involves danger to life or property or state regulation, and on the other hand contractual obligations arising out of such business, is artificial and not consistent with the principle or policy of the statutes and foregoing decisions. The present act affords ample notice and opportunity to be heard. Code Secs. 1437-1440. The transactions in the International Shoe case were not of an economically harmful or dangerous character. This process statute affords basis for jurisdiction of any liability-existing conduct which results from and arises out of the doing of business within the state by a non-resident.

Under the evidence the jury was entitled to accept the appellee's version of his contract, with respect to its terms concerning the rent and to the identity of the contracting parties. ■■ ■ The statements sent appellee by appellant Company did not constitute stated accounts binding upon him, if the jury accepted, as it did, the testimony of appellee that he had protested the charges for rent, and that Wood, acting for appellant, agreed not to make them. Nor was there any error in the only in-

struction obtained by appellee on the merits. It made the issue in the case whether plaintiff agreed with appellant to pay rents to the corporation. Moreover, appellant obtained a somewhat amplified instruction upon the same theory.

Affirmed.

PER CURIAM.

The above opinion is adopted as the opinion of the Court, and for the reasons therein indicated the case is affirmed.