SHEMPER *v.* LATTER & BLUM, INC.

Apr. 28, 1952.

No. 38392 (58 So. (2d) 359)

Rushing & Guice, for appellant.

**O. K. Wiesenburg,** for appellee.

### Ethridge, J.

Appellee and cross-appellant, Latter and Blum, Inc., is a large real estate brokerage agency incorporated under the laws of Louisiana, with its principal place of business in New Orleans. It instituted the present action in the Circuit Court of Jackson County, Mississippi, against appellant and cross-appellee, Israel Shemper, Sr., seeking to recover from Shemper $1,500 under the terms of a brokerage contract with him. Shemper pleaded that Latter and Blum was doing business in Mississippi without having qualified in this State and was therefore not entitled to sue in the state courts; denied the existence of any obligation under any such contract; and further pleaded by a ''cross-complaint'' that Shemper had incurred certain damages as a result of Latter and Blum's

breach of the contract, and asked for a recovery over against Latter and Blum. The circuit court granted a peremptory instruction for Latter and Blum for $1,000 for the corporation having obtained a lease for Shemper on his property, denied appellee the additional fee of $500 which it claimed was owed it for having obtained a loan for Shemper, and denied Shemper any relief under his counterclaim. From this judgment Shemper appeals, and Latter and Blum cross appeal. We affirm the decision of the circuit court.

It is first contended by appellant that Latter and Blum, Inc., was doing business in this state within the provisions of Code of 1942, Secs. 5319, 5343, 5344, and that, therefore, appellee was disabled from suing in Mississippi courts. Latter and Blum has no office in this state. Its principal office is in New Orleans. It sells real estate, but not to Mississippians, and makes loans. Within the past five years it has sold a few pieces of property in Mississippi, and has sold between three to five leases on Mississippi property. The property covered by those leases was owned by officers of the company. The corporation advertises in magazines of national circulation, and in New Orleans newspapers. From time to time it advertises in such publications that it has Mississippi property for sale, which the owners have referred to it. Practically all of its transactions with reference to Mississippi property, like the present one, are handled by correspondence or by interviews in New Orleans. When the company has a piece of Mississippi real estate listed with it, it usually has it appraised and photographs made of it, and agents must come to Mississippi to do that. Appellee generally handles property to be owned or leased by large merchandising organizations such as Woolworth, Penney and A. & P. It sometimes places its signs on Mississippi property listed with it.

Many people in New Orleans own real estate in Mississippi. The company usually acts to bring out of state buyers and sellers together. Less than one-half of one percent of the company's total sales involve Mississippi

property. It does not have a bank account in this state, and has no agents here. Representatives of the company do not make visits to this state for the purpose of selling Mississippi lands listed with it. None of its negotiations for sales of such land are conducted in Mississippi, and the sale or lease contracts are executed in New Orleans. It sends no agents to Mississippi, other than to take photographs and to appraise. Its primary function is bringing buyer and seller together by correspondence or at its office in New Orleans. These facts are illustrated by the dealings involved in the present case. The contract in question consists of two letters, one executed by both parties in New Orleans, and the other consummated through the United States mail. Negotiations between the parties, and with the lessee and the lender, were conducted either in New Orleans or through the mails.

Under these circumstances, we do not think that Latter and Blum, Inc. was doing business in Mississippi so as to require it to qualify in this state in order to sue in the state courts. North American Mortgage Company v. Hudson, 1936, 176 Miss. 266, 168 So. 79; Dodds v. Pyramid Securities Company, 1933, 165 Miss. 269, 147 So. 328; Knower v. Baldwin, 1943, 195 Miss. 166, 15 So. (2d) 47; Savell v. Schultz, Baujan & Co., Miss. 1952, 57 So. (2d) 151; Marx & Bensdorf, Inc., v. First Joint Stock Land Bank of New Orleans, 1937, 178 Miss. 345, 173 So. 297, is not in point because there the foreign brokerage corporation had an agent who made frequent trips into this state to handle the business of his principal, and the corporation had a substantial volume of sales within the state and maintained an office here. Interstate Realty Co. v. Woods, 5 Cir., 1948, 168 F. (2d) 701, on rehearing, 5 Cir., 170 F. (2d) 694, reversed in 1949, 337 U. S. 535, 69 S. Ct. 1235, 93 L. Ed. 1524, also involved a foreign corporation frequently sending its agents into Mississippi to meet prospective buyers and to show the property to be sold, and transacting a substantial volume of sales in the state with substantial profits over a period

of time. The interstate character of Latter and Blum's operations is primary and substantial, and the minor acts referred to above which occurred in Mississippi in isolated instances and in a very small volume were in themselves part of interstate commercial activities, and do not constitute doing business with this state. See Davis-Wood Lumber Co., Inc., v. Ladner, 1951, 210 Miss. 863, 50 So. (2d) 615.

Both parties contend that the circuit court misinterpreted the contract between them. In May 1949, Latter and Blum, Inc., through its vice president, M. E. Polson, wrote to Shemper in Pascagoula, Mississippi, advising him that they represented a national merchandising concern which would be interested in leasing a "very simple type building constructed for them in Pascagoula", and inquiring if Shemper would be interested in considering such a transaction. It developed that the national concern was the Great Atlantic and Pacific Tea Company, which was interested in opening a food market. Shemper owned a corner lot in Pascagoula. He replied to Polson's letter advising that he would be interested and that he would like to have some details as to the type of building the lessee might want. Three-way negotiations proceeded among Shemper, Latter and Blum, and A. & P. for almost a year. By April 10, 1950, a lease from Shemper to A. & P. was almost ready for execution. Shemper and his attorney went to New Orleans to the office of Latter and Blum. His attorney there dictated a letter on that date from Shemper to Latter and Blum setting forth the terms of the brokerage agrement and the fee which appellee would be paid by Shemper, as follows:

"With reference to the proposed lease with the Atlantic and Pacific Tea Co. on our property on lot #33 of the Rene Krebs Tract situated on the corner of Krebs Avenue and N. Pascagoula St. in the City of Pascagoula, Miss. please be advised that if and when

the lease with this Company is consummated we will pay you as full settlement the sum of $1,000.00 cash.

"If you succeed in placing a loan that is satisfactory to enable us to construct this building, we will pay you an additional sum of $500.00 cash.

"However, this entire obligation on my part depends upon the obtaining of a satisfactory loan."

On May 1, Polson, acting for Latter and Blum, wrote Shemper that the company was negotiating with several large insurance companies to make Shemper a ten-year, 4½ percent loan of $50,000. He advised that one of those companies would be willing to "arrange for interim financing; however, I believe it would be more economical if you could arrange for this financing in a nearby bank." On May 2, Shemper executed a ten-year lease on the property to A. & P. at a monthly rental of $500 with an option in lessee to renew for five years at a monthly rental of $600. On the next day, May 3, Polson acting for appellee wrote Shemper in part as follows:

"I really believe we better go ahead and try to close with the Commonwealth Life Insurance Company. I recommend you sign the application and put up the $250.00, you will not lose it, and I believe the loan will go though. * * *

"Just as a matter of keeping business relations clear, I will appreciate if you will confirm, at the bottom of this letter, your agreement that we will receive the sum of $1500.00 cash payment as our commission, in full, for services rendered in the lease and loan transaction. This amount is to be paid us as soon as you have a positive commitment in writing from the Commonwealth Life Insurance Company or anyone else that makes the loan."

Shemper wrote on the bottom of a copy of this letter, "Approved: Israel Shemper". These two letters of April 10 and May 3 constitute the contract between Shemper and Latter and Blum.

On May 3, Shemper began dismantling the old wooden building on the leased property, and on May 5 foundation work began on the new building. On May 4 Commonwealth Life Insurance Company had written Polson that the financial position of Shemper was such that Shemper would not be able to make monthly payments on any loan from Commonwealth over and above the rentals on the A. & P. lease which Shemper would assign to Commonwealth as collateral, and that, therefore, Commonwealth's maximum loan would be $40,000. On May 10 Shemper wrote a check for $250 to Commonwealth Life Insurance Company to apply on the cost of its commitment for a $40,000 loan to Shemper. On May 13, Shemper wrote Polson that " * * * I still look for further help from you, to place this commitment from the Commonwealth Life Insurance Company with some bank so we can go ahead with the work. I have this day made the payroll on borrowed money as I told you, from my brother in Hattiesburg, but I must have the payroll for next Saturday from some other source, threfore please make arrangements with some one to enable me to get that forty thousand dollars in the next day or two without any delay."

Shemper said that the commitment was originally satisfactory to him and that he accepted it when Commonwealth issued it on May 15, committing Commonwealth to make him a $40,000 loan on the property, but that he then understood that he could get construction money on it. Sometime in late May or early June Shemper returned the commitment to Commonwealth. He testified that it was of no value to him because he could not obtain any interim financing on it during the construction of the building in order to pay for current construction costs; that after the commitment was issued, Polson and he undertook to get banks in Mobile, New Orleans, and Gulfport to handle the interim financing on the building as it was being constructed, apparently secured by a mortgage or the Commonwealth commitment as collateral, but that he could not get any banks to handle this interim financ-

ing; that Commonwealth would not disburse the amount of the loan under the commitment until the building was completed; that he had told Polson prior to the obtaining of the Commonwealth commitment that he would have to have a loan which would enable him to obtain interim financing during construction, and that this was part of the brokerage agreement with Latter and Blum under which he agreed to pay them an extra $500 if they would obtain a loan for him "to enable us to construct this building"; that he had begun construction of the new building upon Polson's assurance that he could get the money during construction; that the Commonwealth commitment was satisfactory provided he could have obtained construction money on it, but otherwise it was worthless to him. As a result of Shemper's inability to get construction financing for the building, he obtained in early June, considerable materials from two building supply companies on credit, and on June 16, he finally obtained a loan from Edelman which enabled him to get construction money, but he had to pay to another person a $2,000 brokerage fee for it and 6 percent interest. In July he obtained a permanent loan at five percent from another company and had to pay a $500 brokerage fee to the local agent to obtain it.

Polson testified that he had originally understood that Shemper was able to put up the building by himself, but that "as the deal progressed" he found out that Shemper would have to get interim financing. He said that they never agreed to obtain for Shemper a construction loan, but he admitted that after the commitment was issued he undertook to obtain interim financing for Shemper based upon the Commonwealth commitment, and he also admitted that by May 1, before the contract-letter of May 3, and before the commitment was issued, he knew that Shemper needed construction money and that Commonwealth had told him that "they would not handle it until after the building was completed".

Latter and Blum argue that there was no ambiguity in the letter-contracts of April 10 and May 3, that appellee was to be paid $1,500 if the lease was made and if the loan was obtained by a commitment from Commonwealth, under the provisions of the letter of May 3; that the evidence shows that appellee has done both of these things, appellant admitting that he had originally accepted the Commonwealth commitment, and that, therefore, appellee was entitled to a peremptory instruction for the entire $1,500. We cannot agree. ██ It is manifest that the brokerage contract between the parties required appellee to obtain a loan which would enable Shemper to have the loan money during the construction of the building, that appellee knew that this was a necessity and part of the agreement, and that appellee failed to obtain a loan which would enable appellant to get construction financing. Hence we do not think that appellee is entitled to the $500 under the loan part of the contract. The letter of April 10 expressly provided that appellee must obtain for appellant a loan "that is satisfactory to enable us to construct this building. * * * " The letter of May 3 refers to obtaining a commitment from Commonwealth "or anyone else that makes the *loan*". But that provision must be construed along with the letter of May 10. The *"loan"* referred to is a loan which would "enable us to construct this building". Polson admitted that he knew before the commitment was issued and before the letter of May 3 that Shemper would have to obtain a loan which would enable him to get construction money.

██ The burden of proof was upon the broker, appellee, to prove the terms of the contract. 12 C. J. S., Brokers, Sec. 11, pages 260-261. And in order to recover, the broker must fully and successfully perform his part of the contract and achieve the result he has contracted to attain. In other words he must comply strictly with the terms of his authorization. 8 Am Jur., Brokers, Sec. 63; 12 C. J. S., Brokers, Sec. 83. The terms of the contract, these facts, and the other evidence referred to above indicate

clearly that the intent of the parties to the contract was for Latter and Blum to get a $500 fee if it obtained a loan which would enable Shemper to get money on it during the construction of the building. Appellee failed to do this, and the circuit court was correct in refusing to allow that fee.

There is no dispute that Latter and Blum obtained for Shemper the lease to A. & P., so the trial court was correct in granting appellee a peremptory instruction on that issue for its $1,000 fee for rendering that service.

Shemper asserts that he was entitled to submit to the jury his counterclaim for damages he suffered because of appellee's failure to obtain for him a construction loan, those damages being measured by the brokerage fees which he had to pay to obtain such a loan from others and by other items set out in his counterclaim. However, the trial court was correct in refusing to submit this issue to the jury and in denying any relief on the alleged counterclaim. A real estate agent is a special agent of limited powers. 8 Am. Jur., Brokers, Sec. 59; 12 C. J. S. Brokers, Sec. 11. Shemper offered to pay appellee a commission if the required loan was obtained. The obligation was unilateral, on Shemper, if appellee performed the act necessary to make the promise ripen into an obligation. If appellee obtained a loan which would enable Shemper to construct the building, it would receive an additional $500 fee. Appellee assumed no obligation to obtain such a loan. It had a right to do so, but it was under no correlative duty. Shemper's obligation existed only if appellee exercised that right, accepted the offer, obtained the loan. Appellee did not exercise that right, but its failure to do so violated no duty to appellant. Hence appellant cannot claim damages for appellee's failure to perform an act which it was not appellee's duty to perform. For that reason, we do not consider any other of the dubious aspects of the alleged counterclaim.

Appellant further contends that the contractual fee of $1,000 for appellee obtaining a lease and the fee of $500 for appellee obtaining a construction loan constituted an inseparable contract, that the obligation to pay one of those amounts depended upon the obligation to pay both of them, and that since appellee failed to obtain the loan appellant owes nothing. However, the contract itself, the letter of April 10, expressly considered the two items separately, and the letter of May 3 must be read along with that fact. And the testimony shows that the parties considered the two amounts as separate fees. We think they constituted separable parts of the contract.

Affirmed.

**McGehee, C. J.**, and **Hall, Kyle,** and **Holmes; JJ.**, concur.